# In the United States Court of Federal Claims

No. 15-355C
Filed February 9, 2018

| | |
|---|---|
| WESTROCK VIRGINIA CORP. (F/K/A MEADWESTVACO VIRGINIA CORP.),<br><br>        Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>        Defendant. | American Recovery and Reinvestment Act ("ARRA"); Section 1603; Open-Loop Biomass Facility; Cost Basis; I.R.C. § 45; Renewable Electricity Production Credit; I.R.C. § 48; Energy Tax Credit; Summary Judgment; RCFC 56. |

*Pamela J. Marple*, *Jerry Stouck*, Greenberg Traurig LLP, Washington, DC, for plaintiff.

*Courtney M. Hutson*, Trial Attorney, *Jason S. Selmont*, Trial Attorney, *G. Robson Stewart*, Assistant Chief, *David I. Pincus*, Chief, *David A. Hubbert*, Acting Assistant Attorney General, Tax Division, Court of Federal Claims Section, United States Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

<u>GRIGGSBY, Judge</u>

## I.    INTRODUCTION

Plaintiff, WestRock Virginia Corp. ("WestRock"), brought this action challenging the amount of the United States Department of the Treasury's (the "Treasury") grant payment to WestRock for reimbursement of certain costs incurred to place into service an open-loop biomass facility, pursuant to Section 1603 of the American Recovery and Reinvestment Act (the "ARRA"). *See generally* Compl. WestRock alleges that the Treasury improperly reduced the amount of this grant payment and it seeks to recover more than $39 million in additional grant funds. *See generally id.* The parties have filed cross-motions for summary judgment on the issue of whether the government properly reimbursed WestRock under Section 1603 and whether WestRock has put forward a reasonable allocation of it cost basis, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RFCF"). *See generally* Pl. Mot.;

Def. Mot.  For the reasons discussed below, the Court **DENIES** WestRock's motion for partial summary judgment; **GRANTS** the government's cross-motion for summary judgment; and **DISMISSES** the complaint.

## II.   FACTUAL AND PROCEDURAL HISTORY[1]

### A.  Factual Background

Plaintiff, WestRock Virginia Corp., is the owner and operator of a paper mill and an open-loop biomass cogeneration facility, both located in Covington, Virginia.  Compl. at ¶ 29; Def. Ex. 2 at 5.  In this action, WestRock alleges that the Treasury improperly reduced the amount of its grant payment to recover certain costs associated with the operation of its open-loop biomass facility under Section 1603 of the ARRA.  Compl. at ¶¶ 6-8.  As relief, WestRock seeks to recover $39,345,074.14 in additional grant funds.  Pl. Mot. at 1.

### 1.   WestRock's Open-Loop Biomass Facility

Generally, an open-loop biomass cogeneration facility uses material that has not been originally intended for use as a fuel source.  *See* I.R.S. Notice 2008-60 §§ 2.02, 3.01, 2008-30 I.R.B. 178.  WestRock's open-loop biomass cogeneration facility produces electricity from steam and a portion of the steam is also used in its paper mill.  Compl. at ¶¶ 32-35; Def. Ex. 4 at 1.

Prior to constructing and placing its open-loop biomass cogeneration facility into service in 2013, WestRock's paper mill had eight boilers that burned various types of fuel, including coal, natural gas, fuel oil, and black liquor.  Compl. at ¶ 30; Def. Ex. 5 at 3, 8.  These pre-existing boilers met the paper mill's steam needs.  Def. Mot. at 5.

WestRock began constructing its open-loop biomass cogeneration facility in October 2011.  Compl. at ¶ 30.  In addition to constructing this open-loop biomass facility, WestRock

---

[1] The facts recited in this Memorandum Opinion and Order are taken from WestRock's complaint ("Compl."); WestRock's motion for partial summary judgment ("Pl. Mot."); the government's cross-motion for summary judgment and opposition to WestRock's motion for partial summary judgment ("Def. Mot."); the Declaration of Courtney M. Hutson filed in support of the government's cross-motion for summary judgment and the exhibits attached thereto ("Def. Ex."); the Declaration of Mark Stockwell ("Stockwell Decl.") filed in support of WestRock's motion for partial summary judgment; and the Declaration of Pamela J. Marple ("Marple Decl.") filed in support of WestRock's motion for partial summary judgment.

retrofitted one of its pre-existing boilers—the Number 2 Recovery Boiler—to supply steam to a new steam turbine generator to generate electricity.  Stockwell Decl. at ¶ 3; Def. Ex. 2 at 7.

WestRock's open-loop biomass facility operates by burning biomass to heat a boiler, which, in turn, generates steam at a rate of approximately 610,000 lbs/hr.  Def. Ex. 2 at 6-7.  In addition, the Number 2 Recovery Boiler generates steam at a rate of approximately 300,000 lbs/hr, which contributes approximately one-third of the facility's total steam used to generate electricity.  Id. at 7; Def. Mot. at 6.

This comingled steam then passes through a steam turbine generator.  Def. Ex. 2 at 7. WestRock extracts a portion of the steam from the steam turbine generator prior to exhaustion and diverts the steam to the paper mill to be used in its industrial process.  Stockwell Decl. at ¶¶ 3, 5.

WestRock's facility has a nameplate electrical production capacity of 74 megawatts.  Pl. Mot. at 5.  On a net basis, WestRock's facility is capable of producing 63 megawatts because approximately 11 megawatts are used to power the facility's internal systems.  Def. Ex. 2 at 6.

In its annual reports to the Treasury, WestRock disclosed that its facility produced 489,277,344 kilowatt hours of electricity in 2014; 524,360,640 kilowatt hours of electricity in 2015; and 522,672,000 kilowatt hours of electricity in 2016.  See Def. Ex. 7 at 3; Def. Ex. 8 at 3; Def. Ex. 9 at 3. And so, WestRock's facility has had an average annual production of approximately 56.6 megawatts, 60.7 megawatts, and 60.5 megawatts for 2014, 2015, and 2016, respectively.  See Def. Mot. at 7 (citing Def. Ex. 7 at 3; Def. Ex. 8 at 3; Def. Ex. 9 at 3); see also Pl. Mot. at 19 (stating that average annual production over the past four years is 59.1 megawatts).

## 2.    Section 1603 Of The American Recovery And Reinvestment Act

President Obama signed the American Recovery and Reinvestment Act into law on February 17, 2009.  See Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009).  The ARRA created a temporary program that offered a cash payment in lieu of a tax credit to certain investors for certain qualified investments in clean energy property.  See id. at § 1603.

Specifically, Section 1603 of the ARRA permits investors in qualifying renewable energy property to apply for a reimbursement of costs in lieu of a tax credit. *See id.* at § 1603(a)-(c). The statute provides, in relevant part, that:

SEC. 1603. Grants For Specified Energy Property In Lieu Of Tax Credits.

(a) IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). No grant shall be made under this section with respect to any property unless such property—
   (1) is placed in service during 2009 or 2010, or
   (2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010.

*Id.* at § 1603(a). And so, under Section 1603, the Secretary of the Treasury provides a grant to each person who places into service specified energy property to reimburse such person for a portion of the expense of such property. *Id.*

With respect to the amount of the grant to be awarded, Section 1603(b)(1) provides that "[t]he amount of the grant . . . shall be the applicable percentage of the basis of such property." *Id.* at § 1603(b)(1). The statute also provides that:

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the term ''applicable percentage'' means—
   (A) 30 percent in the case of any property described in paragraphs (1) through (4) of subsection (d), and
   (B) 10 percent in the case of any other property.

*Id.* at § 1603(b)(2).

Although Section 1603 is silent on what constitutes "basis," the Internal Revenue Code ("I.R.C.") defines "basis" to mean "the cost of such property." *See* I.R.C. § 1012(a). Guidance from the Treasury on applying Section 1603 mirrors this language, and states that basis of property generally is its cost under I.R.C. Section 1012. *See* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 16 (rev. April 2011); Oral Arg. Tr. at 89:15-90:2, Jan. 23, 2018. Section 1603 provides for a grant payment equal to either 30%, or 10% of basis, depending upon

the type of property.  *See* Pub. L. No. 111-5 at § 1603(b), (d), (h).  Open-loop biomass facilities are eligible for the 30% grant payment.  *Id.* at § 1603(b), (d).

### 3.   I.R.C. Sections 48 And 45

A property that is eligible for cash payments in lieu of tax credits under Section 1603 is called a "specified energy property."  *Id.* at § 1603(a).  The definition of a specified energy property is based upon other definitions set forth in I.R.C. Section 45 (renewable electricity production tax credit) and I.R.C. Section 48 (energy tax credit).  *Id.* at § 1603(d); *see also id.* at § 1603(h).

In this regard, Section 1603 defines a specified energy property and provides, in relevant part, that:

> (d) SPECIFIED ENERGY PROPERTY.—For purposes of this section, the term ''specified energy property'' means any of the following:
>     (1) QUALIFIED FACILITIES.—Any qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code.

*Id.* at § 1603(d).

Section 48 of the Internal Revenue Code defines the term "qualified property" and provides, in relevant part, that "the term 'qualified property' [includes]  . . . (I) tangible personal property, or (II) other tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility."  *See* I.R.C. § 48(a)(5)(D).

A qualified property under I.R.C. Section 48 must also be part of a "qualified facility" under I.R.C. Section 45.  *See* Pub. L. No. 111-5 at § 1603(d), (h).  Section 45 of the Internal Revenue Code identifies one type of qualified facility as "a facility using open-loop biomass to produce electricity . . . the construction of which begins before January 1, 2017."  I.R.C. § 45(d)(3)(A).[2]  A qualified property of an open-loop biomass facility is further defined by I.R.S. Notice 2008-60 (the "I.R.S. Notice") which provides that:

---

[2] Section 45 of the Internal Revenue Code defines open-loop biomass to be (i) any agricultural livestock waste nutrients, or (ii) any solid, nonhazardous, cellulosic waste material or any lignin material which is derived from, among other sources, forest products and wood waste material.  I.R.C. § 45(c)(3)(A)(ii).  This provision also defines an open-loop biomass facility as follows:

> (1) In general. For the purposes of § 45(d)(3), an open-loop biomass facility is a power plant consisting of all components necessary for the production of electricity from open-loop biomass (and, if applicable, other energy sources). Thus, a qualified open-loop biomass facility includes all burners and boilers (whether or not burning open-loop biomass), any handling and delivery equipment that supplies fuel directly to and is integrated with such burners and boilers, steam headers, turbines, generators, and all other depreciable property necessary to the production of electricity. . . .

*See* I.R.S. Notice 2008-60 § 3.01(1); 2008-30 I.R.B. 178. In addition, this notice provides that a cogeneration facility—defined as a "facility using open-loop biomass to produce both electric energy and useful thermal energy, such as heat or steam, through the sequential use of energy"—may be a qualified open-loop biomass facility. *Id.* at § 3.02.

The Treasury has also promulgated guidance for the owners of open-loop biomass facilities who wish to apply for a grant payment under Section 1603 (the "Treasury Guidance"). The Treasury Guidance provides that a "Qualified Facility Property is property that is an integral part of a qualified facility described in IRC section 45(d) . . . ." *See* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 12 (rev. April 2011). In this regard, the guidance also provides that an open-loop biomass facility "uses open-loop biomass to produce electricity." *Id.* at 13.

The Treasury Guidance also addresses certain limitations on eligible cost basis with respect to the components of a qualifying facility that are not attributable to a qualifying activity—and costs that are attributable to both nonqualifying and qualifying activities. This guidance provides, in relevant part, that:

---

(3) Open-loop biomass facilities
  (A) In general
    In the case of a facility using open-loop biomass to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which—
      (i) in the case of a facility using agricultural livestock waste nutrients—
        (I) is originally placed in service after the date of the enactment of this subclause and the construction of which begins before January 1, 2017, and
        (II) the nameplate capacity rating of which is not less than 150 kilowatts, and
      (ii) in the case of any other facility, the construction of which begins before January 1, 2017.

I.R.C. § 45(d)(3)(A).

The eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a non-qualifying activity. For example, for a biomass facility that burns fuel other than open-loop biomass or closed-loop biomass, the eligible cost basis is the percentage of the total eligible costs that is equal to the percentage of the electricity produced at the facility that is attributable to the open-loop biomass and closed-loop biomass.  In the case of costs that relate to both a nonqualifying activity and a qualifying activity, the costs must be reasonably allocated between the nonqualifying and qualifying activities.  For example, if combustion equipment burns both qualifying biomass and other fuel, the equipment's eligible cost basis is limited to the percentage of its otherwise eligible cost corresponding to the percentage of the equipment's electricity production that is attributable to the qualifying biomass.

*Id.* at 17.

Lastly, Congress has provided legislative history with respect to the enactment of Section 1603.  The conference report to accompany the ARRA provides that Section 1603 calls for grant payments to an energy property that is "either (1) an electricity production facility otherwise eligible for the renewable electricity production credit or (2) a qualifying property otherwise eligible for the energy credit."  *See* H.R. Rep. No. 111-16, at 621 (2009) (Conf. Rep.).  In describing qualified facilities under I.R.C. Section 45, this legislative history also provides that qualified facilities are "facilities that generate electricity using qualified energy resources."  *Id*. at 620.  The legislative history also specifies that "[n]onbusiness property and property that would not otherwise be eligible for credit under [I.R.C. Section 48] or part of a facility that would be eligible for credit under [I.R.C. Section 45] is not eligible for a grant under the provision."  *Id*. at 621.

### 4.   WestRock's Section 1603 Application

On December 23, 2013, WestRock applied to the Treasury for a Section 1603 grant payment in connection with its open-loop biomass cogeneration facility.  Compl. at ¶ 38.  In the application, WestRock claimed a qualified cost basis of $286,191,571 and requested a payment of $85,857,471—30% of its claimed cost basis.  *Id*. at ¶¶ 6, 38; Def. Ex. 10 at 5.

Based upon a review of WestRock's application, the National Renewable Energy Laboratory ("NREL") determined that WestRock's facility generated both thermal heat (*i.e.*,

process steam) and electricity.[3]  *See* Def. Ex. 12 at 2-3; Def. Ex. 13 at 1-4.  And so, on April 11, 2014, the Treasury requested that WestRock estimate the annual amount of fossil fuel usage at its facility and explain the use of the steam extracted from WestRock's steam turbine generator. Def. Ex. 11 at 1; Def. Ex. 12 at 4.  Based upon the information provided by WestRock, the NREL estimated that approximately 49.1% of the energy in the steam produced at WestRock's facility is used for the production of electricity.  Def. Ex. 12 at 4.  The NREL also determined that WestRock used fossil fuel for startup and flame stabilization of approximately 0.22% of the total fuel used in WestRock's boiler.  *Id.* at 2; Def. Ex. 13 at 1.

The Treasury reduced WestRock's eligible cost basis to 49.1% of WestRock's total claimed cost basis to account for the production of process steam.  Def. Ex. 12 at 4.  The Treasury further reduced WestRock's eligible cost basis by 0.22% to account for the use of fossil fuel.  *Id.*

And so, the Treasury reduced WestRock's total eligible cost basis in the facility to 48.9% of the original claimed cost basis.  *Id.*  Based upon the above-described reductions, the Treasury issued an award letter to WestRock on June 16, 2014, providing a Section 1603 grant payment in the amount of $38,881,758.  Def. Ex. 14 at 1.

### B.  Procedural Background

WestRock commenced this action on April 8, 2015.  *See generally* Compl.  On July 8, 2015, the government filed an answer to the complaint.  *See generally* Answer.

On June 26, 2017, WestRock filed a motion for partial summary judgment and documents in support thereof, pursuant to RCFC 56.  *See generally* Pl. Mot.; Marple Decl.; Stockwell Decl.  On August 8, 2017, the government filed a cross-motion for summary judgment and opposition to WestRock's motion for partial summary judgment and documents in support thereof, pursuant to RCFC 56.  *See generally* Def. Mot.; Def. Exs. 1-26.

---

[3] The Treasury administers the Section 1603 program.  *See* Pub. L. No. 111-5 at § 1603(c).  Owners of a specified energy property seeking a Section 1603 grant payment must submit a grant application and required documentation to the Treasury.  *See id.* at § 1603(a); Def. Mot. at 1 n.2.  Under an interagency agreement with the Department of Energy ("DOE"), DOE's National Renewable Energy Laboratory assists the Treasury in reviewing Section 1603 grant applications.  Def. Mot. at 1, n.2.

On September 15, 2017, WestRock filed a reply in support of its motion for partial summary judgment and a response and opposition to the government's cross-motion for summary judgment. *See generally* Pl. Reply.  On October 24, 2017, the government filed a reply in support of its cross-motion for summary judgment. *See generally* Def. Reply.  On November 13, 2017, WestRock filed a consent motion for a hearing on the parties' cross-motions for summary judgment. *See generally* Pl. Mot. for Hr'g.

On December 4, 2017, the Court directed the parties to file supplemental briefs addressing whether, if the Court determines that WestRock must allocate its cost basis between electricity production and steam production and the Court finds that WestRock's proposed methodologies for doing so do not reasonably allocate cost basis, the Court should dismiss this matter. *See generally* Order, Dec. 4, 2017 (docket entry no. 50).  On December 22, 2017, the parties filed their initial supplemental briefs. *See generally* Pl. Supp. Br.; Def. Supp. Br.  On January 12, 2018, the parties filed their respective responsive supplemental briefs. *See generally* Pl. Supp. Resp.; Def. Supp. Resp.  On January 19, 2018, the parties filed their respective supplemental reply briefs. *See generally* Pl. Supp. Reply; Def. Supp. Reply.  On January 23, 2018, the Court held oral argument in this matter. *See generally* Oral Arg. Tr., Jan. 23, 2018.

The parties' cross-motions for summary judgment having been fully briefed, the Court resolves the pending motions.

## III.   LEGAL STANDARDS

### A.  Jurisdiction And Section 1603

The United States Court of Federal Claims is a court of limited jurisdiction and "possess[es] only that power authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).  The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act

merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976) (citation omitted).  And so, to pursue a claim against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation; an express or implied contract with the United States; or an illegal exaction of money by the United States.  *Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).  "[A] statute or regulation is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'"  *Fisher*, 402 F.3d at 1173 (quoting *United States v. Mitchell*, 463 U.S. 206, 217, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983)) (brackets in original).

This Court has held that Section 1603 is such a money-mandating source of law.  *LCM Energy Sols. v. United States*, 107 Fed. Cl. 770, 772 (2012); *ARRA Energy Co. v. United States*, 97 Fed. Cl. 12, 19-20 (2011).  And so, the Court possesses subject-matter jurisdiction to consider Section 1603 disputes.  *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 690 (2015).  The Court reviews such claims challenging an unfavorable determination by the Treasury regarding an application for a grant payment under Section 1603 *de novo*.  *Id*. at 690.

This Court has previously interpreted Section 1603 to determine the appropriate cost basis of an open-loop biomass cogeneration facility for the purpose of making a grant payment under that statute on two occasions.  In *W.E. Partners II, LLC v. United States* ("*W.E. Partners II*"), the Court applied a three-part test to determine the appropriate cost basis for Section 1603 grant payments for an open-loop biomass cogeneration facility that engaged in both qualifying and nonqualifying activities.  *W.E. Partners II*, 119 Fed. Cl. at 692.  The plaintiff in *W.E. Partners II* owned a facility that produced both electrical energy and thermal energy.  *Id.* at 687-88.  The Court held that, to recover under Section 1603, the plaintiff must show:  (1) whether the "facility is a 'qualified facility' for Section 1603 reimbursement, (2) if the . . . facility is a qualified facility, what property is qualifying, and (3) of the qualifying property, what costs are eligible for reimbursement."  *Id*. at 692.

The Court also held that Section 1603 only provided for reimbursement for the portion of the cost of the plaintiff's facility that was fairly allocable to the production of electricity. *Id.* at 687. And so, the Court concluded that the plaintiff in that case must reasonably allocate the costs between its electricity production—a qualifying activity—and its process-steam production—a nonqualifying activity—and adjust its cost basis accordingly. *Id.* at 694; *see also* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 17. Because the Court found that the plaintiff in *W.E. Partners II* failed to put forth a reasonable allocation of its cost basis based upon this standard, the Court concluded that the plaintiff was not entitled to an additional grant payment under Section 1603. *See W.E. Partners II*, 119 Fed. Cl. at 694. The Federal Circuit subsequently affirmed the Court's decision in a non-precedential opinion. *See W.E. Partners II, LLC v. United States*, 636 Fed. App'x 796 (Fed. Cir. 2016) (without op.).

More recently, the Court revisited the issue of how to allocate cost basis in connection with a Section 1603 grant payment in *GUSC Energy, Inc. v. United States* ("*GUSC Energy*"), 129 Fed. Cl. 118 (2016). In that case, the Court again applied the three-part test from *W.E. Partners II* to determine the amount of the grant payment due under Section 1603. *Id*. at 123-25 (citing *W.E. Partners II*, 119 Fed. Cl. at 692, 694). To calculate the costs eligible for reimbursement, the Court held that an open-loop biomass cogeneration facility that provided both electricity and steam heat to a neighboring office park was required to reduce its cost basis to reflect the diminished efficiency of the facility's electricity production resulting from the facility's steam production. *Id*. at 124-25. The Court accomplished this allocation by "compar[ing] the generation efficiency to that of a typical biomass plant producing only electricity." *Id*. at 124. The Court also held that Congress created 30 percent grants under Section 1603 to subsidize electricity production, not steam heat production. *Id*. at 124. And so, the Court concluded that the plaintiff in *GUSC Energy* was entitled to an additional grant payment under Section 1603 for the costs reasonably attributable to electricity production at its facility. *Id*. at 125.

**B.   RCFC 56**

Pursuant to RCFC 56, a party is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC

56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Biery v. United States*, 753 F.3d 1279, 1286 (Fed. Cir. 2014). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. A fact is "material" if it could "affect the outcome of the suit under the governing law." *Id.*

The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). And so, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)).

In making a summary judgment determination, the Court does not weigh the evidence presented, but instead must "determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249; *see also Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004); *Agosto v. INS*, 436 U.S. 748, 756, 98 S. Ct. 2081, 56 L. Ed. 2d 677 (1978) ("[A trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented . . . .") (citations omitted). The Court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . . ." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

The above standard applies when the Court considers cross-motions for summary judgment. *Principal Life Ins. Co. & Subs. v. United States*, 116 Fed. Cl. 82, 89 (2014); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010). And so, when both parties move for summary judgment, "'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Abbey v. United States*, 99 Fed. Cl. 430, 436 (2011) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### C. Statutory Interpretation

When interpreting a statute, the Court must start with the plain language. *Barela v. Shinseki*, 584 F.3d 1379, 1382-83 (Fed. Cir. 2009) (citation omitted). Statutes are not, however, interpreted in a vacuum and the Court "must consider not only the bare meaning of each word

but also the placement and purpose of the language within the statutory scheme." *Id.* at 1383 (citation omitted). And so, a statute's meaning, regardless of whether the language is plain or not, depends on context. *Id.* (citation omitted).

Generally, this Court defers to an agency's interpretation of ambiguous statutory provisions, provided that the interpretation is reasonable. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). When the Court reviews an agency's construction of a statute which it administers, the Court is confronted with two questions. First, the Court examines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If so, the Court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43; *see also Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1362 (Fed. Cir. 2005).

If the statute is ambiguous, the Court must proceed to step two and examine "whether the agency responsible for filling a gap in the statute has rendered an interpretation that is based on a permissible construction of the statute." *Doe v. United States*, 372 F.3d 1347, 1358 (Fed. Cir. 2004) (citations omitted); *see also Cathedral Candle Co.*, 400 F.3d at 1364-65. And so, this standard of deference should apply, where "Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" *Cathedral Candle Co.*, 400 F.3d at 1361 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)).

The United States Court of Appeals for the Federal Circuit has also recognized that, even when *Chevron* deference is not appropriate, "an agency's construction of a statute that it is charged with administering is still subject to some deference under the standard set forth by the Supreme Court in *Skidmore v. Swift & Co.*" *Id.* at 1365 (Fed. Cir 2005); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L. Ed. 2d 124 (1944). While *Skidmore* deference does not entail the same degree of deference as the *Chevron* standard, the Court must, nonetheless, give some deference to informal agency interpretations of ambiguous statutory provisions. *Cathedral Candle Co.*, 400 F.3d at 1365. And so, the Federal Circuit has held that the Court should defer to an agency's interpretation of a statute that it administers if: (1) the agency has conducted a careful analysis of the statutory issue; (2) the agency position has been

consistent and reflects agency-wide policy; and (3) the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if the Court might not have adopted that construction absent the benefit of the agency's analysis. *Id.* at 1366; *see also Mead Corp.*, 533 U.S. at 234 (holding that an agency interpretation may merit some deference "given the specialized experience and broader investigations and information available to the agency") (citations omitted).

In *W.E. Partners II*, this Court held that the lesser standard of deference articulated in *Skidmore* should apply to the Treasury's interpretation of Section 1603 for four reasons. *W.E. Partners II*, 119 Fed. Cl. at 691-92. First, the Court found I.R.S. Notice 2008-60 and the Treasury Guidance for Section 1603 to represent an agency-wide policy. *Id.* at 692. Second, the Court found that this guidance had not been formulated belatedly in response to litigation. *Id.* Third, the Court found that the reasons for the agency's guidance were clear. *Id.* Lastly, the Court found that the Treasury "is explicitly granted recapture authority for any grants to property that ceases to be 'specified energy property'" in Section 1603(f), and that this authority—and the discretion afforded to the agency—"suggest Congress's intent to defer to the agency with the administration of [Section 1603]." *Id.*[4]

## IV.   LEGAL ANALYSIS

The parties have filed cross-motions for summary judgment on the issues of whether WestRock must allocate its cost basis and whether the government is liable to WestRock for an additional grant payment under Section 1603. In its motion for partial summary judgment, WestRock argues that it is entitled to summary judgment in its favor because: (1) Section 1603 mandates a grant payment to WestRock in an amount equal to 30% of the cost basis in its open-loop biomass facility, or, (2) alternatively, WestRock has put forward a reasonable allocation of its cost basis and this allocation demonstrates that WestRock is entitled to receive an additional grant payment under Section 1603. Pl. Mot. at 25-37.

The government opposes WestRock's motion and argues in its cross-motion for summary judgment that the government is entitled to summary judgment in its favor as a matter of law for

---

[4] The Court observed, however, that one limiting factor to affording deference to the Treasury's interpretation of Section 1603 was the inconsistency of the agency's interpretation of the statute as applied to past reimbursements. *W.E. Partners II*, 119 Fed. Cl. at 692.

four reasons:  (1) Section 1603 does not provide for a grant payment for process steam production, which is a nonqualifying activity; (2) WestRock's proposed allocations of cost basis are unreasonable, because these allocations do not allocate the costs between WestRock's open-loop biomass facility's steam production and electricity production activities; (3) to the extent that the Court adopts a "primary purpose" exception to the requirement to allocate cost basis with regards to Section 1603 payments, material facts remain in dispute regarding whether the primary purpose of WestRock's facility is to generate electricity; and (4) even if the Court accepts any of WestRock's proposed methodologies for allocating cost basis, WestRock's cost basis must be reduced to exclude the costs associated with nonqualifying property.  Def. Mot. at 19-43.

For the reasons discussed below, the Court reads Section 1603 to provide for the reimbursement of only those costs associated with electricity production activities at WestRock's open-loop biomass facility.  The Court also reads this statute and the applicable Treasury Guidance to require that WestRock allocate its cost basis between steam production and electricity production activities for all qualified property at its open-loop biomass facility.

In addition, the undisputed material facts in this matter show that WestRock has not met its burden to put forward a reasonable allocation of the cost basis for its open-loop biomass facility, because WestRock's proposed allocation methodologies either, (1) do not allocate the costs between the facility's electricity production and steam production activities, or (2) lack evidentiary support.  And so, for the reasons discussed below, the Court **DENIES** WestRock's motion for partial summary judgment; **GRANTS** the government's cross-motion for summary judgment; and **DISMISSES** the complaint.

### A.  Section 1603 Reimburses The Costs Of Electricity Production At Open-Loop Biomass Facilities

As an initial matter, the Court construes Section 1603 to reimburse only those costs associated with electricity production at open-loop biomass facilities.  In their cross-motions for summary judgment, the parties disagree about whether Section 1603 is intended to only reimburse the costs associated with electricity production at open-loop biomass facilities.  WestRock argues that Section 1603 "does not require that facilities produce nothing but electricity in order to obtain a 30% basis payment."  Pl. Mot. at 31.  The government counters

that Section 1603 is intended to only reimburse the costs associated with electricity production and that this statute does not provide for a payment for "the non-qualifying activity of process steam production." Def. Mot. at 19. For the reasons discussed below, the Court agrees with the government that Section 1603 reimburses only the costs associated with electricity production.

The Court begins its analysis with the plain text of Section 1603. *Barela v. Shinseki*, 584 F.3d 1379, 1382-83 (Fed. Cir. 2009). In this regard, a plain reading of Section 1603 makes clear that the grant payment provided for in this statute is intended to reimburse only the costs for electricity production at open-loop biomass facilities. Section 1603 provides for a one-time, lump-sum payment in lieu of existing energy tax credits to new investments in certain types of renewable energy products. Pub. L. No. 111-5 at § 1603 (entitled "Grants For Specified Energy Property In Lieu Of Tax Credits"). To accomplish this, Section 1603 provides that:

> (a) IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). No grant shall be made under this section with respect to any property unless such property—
>     (1) is placed in service during 2009 or 2010, or
>     (2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010.

Pub. L. No. 111-5 at § 1603(a).

Section 1603(d) further provides that the "applicable percentage" of cost basis for determining the amount of the grant payment due under the statute is "30 percent in the case of any property" that is a "qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code." *Id*. at § 1603(d); *see also id*. at § 1603(b); I.R.C. §§ 45, 48. And so, the plain text of Section 1603 provides for the reimbursement of certain costs associated with "qualified property" that is located at a "qualified facility," in lieu of receiving a tax credit.

Because Section 1603 provides for a grant payment in lieu of existing energy tax credits, this statute must be read within the context of the Internal Revenue Code provisions that address

energy tax credits.  *See* Oral Arg. Tr. at 36:10-39:20.  In this regard, I.R.C. Sections 45 and 48 are expressly referenced in Section 1603.  *See* Pub. L. No. 111-5 at § 1603(d).

Specifically relevant here, I.R.C. Section 45(c)(3) addresses tax credits for "*electricity produced from certain renewable sources*," including open-loop biomass facilities.  I.R.C. § 45 (emphasis supplied).  I.R.C. Section 45(d)(3) also defines qualified open-loop biomass facilities as follows:

> (3) Open-loop biomass facilities
>> (A) In general.  In the case of a facility using open-loop biomass *to produce electricity*, the term "qualified facility" means any facility owned by the taxpayer . . .
>> . . . .
>> (ii) . . . the construction of which begins before January 1, 2017.

I.R.C. § 45(d)(3)(A) (emphasis supplied).  And so, I.R.C. Section 45 expressly provides that an open-loop biomass facility is "a facility using open-loop biomass to *produce electricity*." *Id.* (emphasis supplied).

I.R.C. Section 48 also provides that "the term 'qualified property' [includes]  . . . (I) tangible personal property, or (II) other tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility."  *See* I.R.C. § 48(a)(5)(D).  "Qualified property" under Section 48 must also be part of a "qualified facility" under I.R.C. Section 45 and, as discussed above, I.R.C. Section 45 makes clear that one type of qualified facility is a facility using open-loop biomass to produce electricity.  I.R.C. § 45(d)(3)(A) (emphasis supplied).  And so, when read within the context of I.R.C. Sections 45 and 48, the Court construes Section 1603 to require that any grant payment in lieu of a tax credit made to the owner of an open-loop biomass facility reimburse only those costs associated with electricity production.  *See* Pub. L. No. 111-5 at § 1603(d)(1); I.R.C. §§ 45(d)(3)(A), 48(a)(5)(D)(i)(II).[5]

---

[5] During oral argument, WestRock argued that it is also eligible for a grant payment in lieu of tax credit under I.R.C. Section 48.  Oral Arg. Tr. at 23:8-12, 26:23-27:15.  This does not change the Court's analysis.  Any grant payment to WestRock pursuant to I.R.C. Section 48 would similarly be limited to electricity production activities, because the "qualified property" at WestRock's facility must be part of a "facility using open-loop biomass to produce electricity."  *See* Pub. L. No. 111-5 at § 1603(d)(1); I.R.C. § 48(a)(5)(D) (defining "qualified property" in relation to whether that property is "an integral part of the qualified investment credit facility"); I.R.C. § 45(d)(3)(A); *see generally* Oral Arg. Tr. at 39:6-39:20, 42:4-44:13.

The Court's reading of Section 1603 is reinforced by the legislative history for this statute. The conference report to accompany the ARRA states that Section 1603 provides for a grant payment in lieu of a tax credit to an energy property that is "either (1) *an electricity production facility* otherwise eligible for the renewable electricity production credit [under I.R.C. § 45] or (2) qualifying property otherwise eligible for the energy credit [under I.R.C. § 48]." *See* H.R. Rep. No. 111-16, at 620-21 (Feb. 12, 2009) (Conf. Rep.) (emphasis supplied). This conference report also notes that:

> An income tax credit is allowed for the *production of electricity* from qualified energy resources at qualified facilities (the "renewable electricity production credit"). Qualified energy resources comprise wind, closed-loop biomass, open-loop biomass, geothermal energy, solar energy, small irrigation power, municipal solid waste, qualified hydropower production, and marine and hydrokinetic renewable energy. Qualified facilities are, generally, facilities that *generate electricity* using qualified energy resources.

*Id*. at 620 (emphasis supplied). Given this, the legislative history for Section 1603 also makes clear that Congress intended for Section 1603 grant payments to reimburse only electricity production at open-loop biomass facilities. *See* H.R. Rep. No. 111-16, at 620-21.

The Court is also unpersuaded by WestRock's argument that Section 1603 grant payments should not be limited to electricity production activities at open-loop biomass facilities, because this statute provides for a 30% cost basis grant payment to solar facilities, even if such facilities do not produce electricity. *See* Pl. Mot. at 31. As the government correctly observes in its cross-motion, Section 1603 applies to different types of facilities and the activities that may qualify for reimbursement under the statute vary depending upon how the technology employed at a particular facility is defined. Def. Mot. at 23-24; *see* Pub. L. No. 111-5 at § 1603(d)(1)-(8). In the case of a solar facility, the Court reads Section 1603 and I.R.C. Section 48 to define "solar property" to be equipment that uses solar energy to generate electricity, to heat or cool, or provide hot water for use in a structure or to provide solar process heat, or to illuminate the inside of a structure. *See* Pub. L. No. 111-5 at § 1603(d)(3); I.R.C. § 48(a)(3). And so, the owner of a solar facility that employs solar property to engage in any of these activities would be eligible for a grant payment under Section 1603, because all of these activities are qualified activities under the statute. *Id.*

In contrast, here, Section 1603 and I.R.C. Section 45 define an open-loop biomass facility as "a facility using open-loop biomass to produce electricity." *See* I.R.C. § 45(d)(3); *see also* Pub. L. No. 111-5 at § 1603(d)(1). Given this, WestRock may not receive a grant payment under Section 1603 for the steam production activities that take place at its open-loop biomass facility. And so, the Court **DENIES** WestRock's motion for partial summary judgment and **GRANTS** the government's motion for summary judgment on the threshold issue of whether WestRock may be reimbursed for the costs associated with steam production at its open-loop biomass facility.

**B.  Section 1603 And Treasury Guidance Require That WestRock Allocate Cost Basis**

Because the Court finds that WestRock may recover a grant payment under Section 1603 for only electricity production at its open-loop biomass facility, the Court next considers whether WestRock must allocate its cost basis in that facility to account for the costs attributable to steam production and those costs attributable to electricity production. And so, for the reasons discussed below, the Court **DENIES** WestRock's motion for partial summary judgment and **GRANTS** the government's cross-motion for summary judgment on this issue.

A reading of Section 1603 and the relevant Treasury Guidance demonstrates that WestRock must allocate its cost basis between the electricity production and steam production activities at its open-loop biomass facility.

As discussed above, Section 1603 provides that the amount of the grant payment to be awarded by the Secretary under Section 1603 shall be 30 percent of WestRock's cost basis of the qualified property at its open-loop biomass facility. Pub. L. No. 111-5 at § 1603(b), (d); *see also* I.R.C. §§ 45, 48. But, as WestRock correctly observes in its motion for partial summary judgment, Section 1603 does not expressly require—or even address—the allocation of costs basis. Pl. Mot. at 27-28; *see generally* Pub. L. No. 111-5 at § 1603. Because Section 1603 is silent in this regard, the Court must examine "whether the agency responsible for filling a gap in the statute has rendered an interpretation that is based on a permissible construction of the statute." *Doe v. United States*, 372 F.3d 1347, 1358 (Fed. Cir. 2004) (citations omitted); *see also Cathedral Candle Co.*, 400 F.3d at 1364-65.

In this case, the Treasury has issued sound guidance regarding how to determine eligible cost basis under Section 1603 for open-loop biomass facilities that engage in both qualifying and nonqualifying activities.  *See* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 16-17 (rev. April 2011).  The Treasury Guidance provides that "[t]he eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a non-qualifying activity." *Id.* at 17.  And so, the Treasury Guidance requires that, "[i]n the case of costs that relate to both a nonqualifying activity and a qualifying activity, the costs must be reasonably allocated between the nonqualifying and qualifying activities." *Id*.

The Treasury's interpretation of Section 1603 as embodied in this guidance is reasonable and should be afforded deference by this Court.  As discussed above, the plain text of Section 1603 and the legislative history for this statute make clear that the grant payments to the owners of open-loop biomass facilities pursuant to Section 1603 may only reimburse those costs associated with electricity production.  *See* Pub. L. No. 111-5 at § 1603(d)(1); I.R.C. §§ 45, 48. Because some open-loop biomass facilities that produce electricity also engage in other kinds of energy production activities—like WestRock's facility in this case—the Treasury has appropriately issued guidance regarding how to calculate cost basis under such circumstances.

The Court does not read Section 1603 to indicate that Congress intended to delegate broad interpretive authority to the Treasury to warrant the application of *Chevron* deference to this guidance.  But, the Court observes that Section 1603(f) does provide that, "[i]n making grants under [Section 1603], the Secretary of the Treasury shall apply rules similar to the rules of section 50 of the Internal Revenue Code of 1986." Pub. L. No. 111-5 at § 1603(f).  And so, the Court concludes that some deference should be afforded to the Treasury's interpretation of Section 1603 as embodied in the agency's guidance.  *Cathedral Candle Co.*, 400 F.3d at 1361.

The United States Court of Appeals for the Federal Circuit has recognized that, even when *Chevron* deference does not apply, "an agency's construction of a statute that it is charged with administering is still subject to some deference under the standard set forth by the Supreme Court in *Skidmore v. Swift & Co*." *Id.* at 1365 (Fed. Cir 2005); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 65 S. Ct. 161, 89 L. Ed. 2d 124 (1944).  The Federal Circuit has also held that the Court should defer to an agency's interpretation of a statute that it administers if:  (1) the

agency has conducted a careful analysis of the statutory issue; (2) the agency position has been consistent and reflects agency-wide policy; and (3) the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if the Court might not have adopted that construction absent the benefit of the agency's analysis. *Cathedral Candle Co*., 400 F.3d at 1366; *see also United States v. Mead Corp*., 533 U.S. 218, 234, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) (holding that an agency interpretation may merit some deference "given the specialized experience and broader investigations and information available to the agency"). The Court agrees and finds WestRock's argument that the Court should not similarly defer to the Treasury's interpretation of Section 1603 in this case to be misguided. *See* Pl. Mot. at 29-31.

In *W.E. Partners II*, this Court specifically held that *Skidmore* deference should be afforded to the Treasury's interpretation of Section 1603 at issue here, because I.R.S. Notice 2008-60 and the Treasury Guidance for Section 1603 represented an agency-wide policy; the guidance had not been formulated belatedly in response to litigation; the reasons for the agency's guidance were clear; and Section 1603(f) suggested that Congress intended to defer to the agency with respect to the administration of Section 1603. *W.E. Partners II*, 119 Fed. Cl. at 691-92.  In this case, the undisputed material facts show that the Treasury Guidance directly addresses the issue at the heart of this dispute—whether WestRock must allocate its cost basis between qualifying and nonqualifying activities. *See* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 12-13, 17 (rev. April 2011).  The undisputed material facts in this case also show that the Treasury issued this guidance on payments for specified energy property in lieu of tax credits after careful analysis of Section 1603. *Id.* at 2-3.  The undisputed material facts similarly show that the Treasury Guidance was not belatedly adopted in response to this litigation, because the agency first issued this guidance in 2009—several years before WestRock submitted its grant payment application or commenced this litigation. *See id.* at 2.

In addition, the Treasury Guidance is consistent with Section 1603 and an agency-wide policy. *See W.E. Partners II*, 119 Fed. Cl. at 690-92.  Given this, application of *Skidmore* deference to the Treasury Guidance is appropriate in this case.[6]  *See id.*; *see also* U.S. Treas.

---

[6] The Court observes, however, that in reaching the conclusion to apply *Skidmore* deference, it has some concerns about the occasional inconsistencies in the Treasury's application of the guidance to Section 1603.  During oral argument, the government acknowledged that the agency's guidance has not always

Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 12-13.

Because the Treasury's guidance requires that "[t]he eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a non-qualifying activity"—and there is no dispute that WestRock's open-loop biomass facility produces both electricity (a qualifying activity) and steam (a nonqualifying activity)—the Court concludes that WestRock must allocate its cost basis between these two activities to determine its eligible cost basis under Section 1603. *Id.* at 17. And so, the Court **GRANTS** the government's motion for summary judgment and **DENIES** WestRock's motion for partial summary judgment on this issue.

### C. WestRock's Proposed Allocations Of Cost Basis Are Not Reasonable

Because WestRock must allocate its cost basis—and the parties agree that the allocation of WestRock's cost basis must be reasonable—the Court next considers whether any of WestRock's proposed methodologies for allocating its cost basis are reasonable.

WestRock puts forward five proposed methodologies for allocating the cost basis for its open-loop biomass facility based upon qualifying activities. Pl. Mot. at 35-37; Pl. Supp. Br. at 8-12. First, WestRock proposes an "allocation of costs based on efficiency of facility" methodology, which reduces WestRock's cost basis in its open-loop biomass facility to take into account the reduced efficiency of the facility due to the nonqualifying activity of steam production ("Option 1"). Pl. Supp. Br. at 8-9; Oral Arg. Tr. at 70:12-72:2. WestRock explains that this methodology compares "the energy efficiency of [its] biomass facility with the average energy efficiency of biomass facilities generally," and uses this ratio to allocate WestRock's cost basis. Pl. Supp. Br. at 8 (citing Marple Decl. at Ex. 16 at 7, 24); *see generally* Marple Decl. at

---

been employed uniformly. Oral Arg. Tr. at 47:11-49:20 ("[T]here were over 100,000 applications to this program. . . . [I]t's clear that there could be a mistake here and there."). But, the government also persuasively argued that affording *Skidmore* deference to the Treasury Guidance is, nonetheless appropriate here, because the Treasury has generally applied this guidance consistently and the agency also has expertise in interpreting and applying the federal tax laws. *Id.* at 44:15-49:24; *see also Fed. Express Corp. v. United States*, 552 U.S. 389, 399-400, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2007) ("Some degree of inconsistent treatment is unavoidable when the agency processes over 175,000 inquiries a year.").

Ex. 16 (providing filings from *GUSC Energy* discussing Mr. Trent Markell's expert opinion in that case).

Second, WestRock proposes an "allocation of property based on electricity production" methodology, which reduces WestRock's cost basis to account for the reduced amount of electricity produced at its open-loop biomass facility ("Option 2"). Pl. Supp. Br. at 9; Marple Decl. at Ex. 11 at 8-9 (observing that WestRock's open-loop biomass facility would produce approximately 4% more electricity if it produced only electricity); *see also* Pl. Mot. at 36-37. WestRock states that this methodology removes "certain costs based [upon its] facility's electricity production" and allocates costs based on the percentage of electricity that is lost because the facility sends a portion of its steam to the paper mill. Pl. Supp. Br. at 9; Oral Arg. Tr. at 72:4-73:9. WestRock acknowledges, however, that this methodology does not apply the reduction in costs to all of the property at its facility that is used for both steam production and electricity production. Marple Decl. at Ex. 11 at 8.

Third, WestRock puts forward an "allocation of costs by necessary property" methodology, which reduces its cost basis in the open-loop biomass facility to remove the costs incurred to send steam to its paper mill ("Option 3"). Pl. Mot. at 35-36; Pl. Supp. Br. at 9-10; *see also* Oral Arg. Tr. at 73:10-73:20. Fourth, WestRock proposes a "cost per kilowatt of electricity" methodology, which allocates its cost basis to reflect the cost of producing electricity ("Option 4"). Pl. Supp. Br. at 10. WestRock explains that this fourth methodology compares and applies "a percentage based on the costs per electricity generated (kilowatt) of the facility at issue with the average cost per kilowatt for biomass facilities." *Id.*; Oral Arg. Tr. at 73:21-74:13; *see also* Marple Decl. at Ex. 10 at 11 (relying upon the expert analysis of Mr. Markell in the *W.E. Partners II* case). As a final option, WestRock proposes that the Court develop its own methodology for reasonably allocating WestRock's cost basis, based upon the evidence before the Court ("Option 5"). Pl. Supp. Br. at 10; Oral Arg. Tr. at 61:10-62:3, 65:25-66:23.

WestRock has not shown that any of its methodologies for allocating cost basis are reasonable. Rather, the undisputed material facts in this matter show that WestRock's proposed methodologies for allocating cost basis either fail to account for qualified property that is used for both qualifying and nonqualifying activities, or lack evidentiary support.

First, WestRock acknowledges that its "allocation of property based on electricity production" methodology and its "allocation of costs by necessary property" methodology (Options 2 and 3) do not actually allocate the cost of all qualified property used for both steam production and electricity production between these two activities.  *See* Pl. Mot. at 35-37; Pl. Reply at 39-42; Pl. Supp. Br. at 8-12; *see generally* Marple Decl. at Exs. 10-11.  Specifically, WestRock concedes that its "allocation of property based on electricity production" methodology only allocates the costs associated with the electricity turbine at its facility.  Pl. Mot. at 36-37; Marple Decl. at Ex. 11 at 8; *see also* Pl. Supp. Br. at 9 n.16 (stating without providing any evidence that the Court could apply the allocation percentage, calculated only for the steam turbine, to the remainder of WestRock's facility).

WestRock's "allocation of costs by necessary property" methodology is similarly flawed. This methodology simply removes the cost of extracting steam from WestRock's open-loop biomass facility—a nonqualifying activity that is not eligible for a Section 1603 payment.  Def. Mot. at 33-34; Oral Arg. Tr. at 52:15-54:16, 84:19-84:22; *see also* Marple Decl. at Ex. 11 at 6. Given this, neither of these two methodologies reasonably allocate WestRock's cost basis.

The remaining three methodologies that WestRock advances also fail to reasonably allocate cost basis, because these allocations are not supported by the evidence.  WestRock acknowledges that its "allocation of costs based on efficiency of facility" methodology and its "cost per kilowatt of electricity" methodology rely upon expert opinions rendered in other cases. *See* Marple Decl. at Ex. 10 at 11 (relying upon the expert analysis in *W.E. Partners II* to support Option 4); Marple Decl. at Ex. 16 at 7, 24 (relying upon the expert analysis in *GUSC Energy* to support Option 1).  While the Court recognizes that the expert reports relied upon by WestRock to support these methodologies may have provided a reasonable method for allocating cost basis in other cases, WestRock does not explain how the factual circumstances presented here— regarding its own open-loop biomass facilities—are analogous to the facts in those cases.  *See* Pl. Supp. Br. at 8-12; *see generally GUSC Energy*, 129 Fed. Cl. at 124-25; *W.E. Partners II*, 119 Fed. Cl. at 693-94.

WestRock also fails to show that there is an evidentiary basis for the Court to make its own allocation of cost basis.  While WestRock is correct that the Court may determine a reasonable methodology for allocating cost basis, based upon the evidence in this case, the

evidence before the Court is insufficient for the Court to do so here.  WestRock points to no evidence that the Court could rely upon to develop its own allocation methodology.  *See generally* Pl. Supp. Br. at 8-10.  Given this, WestRock has simply not met its burden to reasonably allocate its cost basis based upon the evidence in this case.  *See Kraft*, 30 Fed. Cl. at 765 ("If the court is not satisfied that [the] taxpayer has properly allocated a value to an identified . . . asset, it is not *a fortiori* the duty of the court to determine that value, but the court may do so if . . . the value can be determined from a review of the record in its entirety.").

Because the Court concludes that the undisputed material facts show that WestRock has not put forward a reasonable allocation of its cost basis, the Court **GRANTS** the government's motion for summary judgment and **DENIES** WestRock's motion for partial summary judgment on this final issue.[7]  For this same reason, the Court must dismiss the complaint.

WestRock bears the burden of proving that it is entitled to an additional grant payment under Section 1603, including the amount of any additional grant payment due in this *de novo* tax matter.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also* Oral Arg. Tr. at 16:7-20:10, 62:4-62:15.  The amount of any additional grant payment due to WestRock under Section 1603 must also be determined by, among other things, establishing WestRock's eligible cost basis in its open-loop biomass facility.  Pub. L. No. 111-5 at § 1603(b)(1)-(2); *see* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 16-17 (rev. April 2011).  Because WestRock fails to put forward a sound methodology for allocating the cost basis in its open-loop biomass facility to determine its eligible cost basis, WestRock cannot establish the amount of any additional grant payment that may be due under Section 1603 in order to prevail in this case.  *See W.E. Partners II*, 119 Fed. Cl. at 693-94.

WestRock's argument that the Court should not dismiss this matter at this stage in the proceedings because the government has not shown an entitlement to summary judgment in its favor is also unavailing.  *See* Pl. Supp. Br. at 14-19.  The government has demonstrated that it is entitled to summary judgment in its favor in this case by demonstrating that WestRock has not

---

[7] Because the Court concludes that WestRock has not met its burden to demonstrate a reasonable allocation of its cost basis, the Court does not reach the remaining issues raised in the parties' cross-motions for summary judgment.

proven an entitlement to an additional grant payment under Section 1603. *Celotex Corp.*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the [trial] court—that there is an absence of evidence to support the nonmoving party's case."). The Court also observes that the parties completed extensive fact and expert discovery, and several rounds of briefing and supplemental briefing on the issue of the allocation of WestRock's cost basis, before the Court addressed their cross-motions for summary judgment. *See generally* Order, Dec. 4, 2017 (docket entry no. 50); Scheduling Order, Feb. 15, 2017 (docket entry no. 28); Initial Scheduling Order, Sept. 4, 2015 (docket entry no. 9). Given this, additional discovery or a trial would not produce additional evidence regarding a reasonable allocation of WestRock's eligible cost basis. And so, under these circumstances, it is appropriate for the Court to **DISMISS** the complaint.

## V.     CONCLUSION

In sum, the undisputed material facts in this matter show that WestRock must reasonably allocate the cost basis in its open-loop biomass facility to account for qualified property that is used for both electricity production activities and steam production activities, to determine its eligible cost basis. The undisputed material facts also show that WestRock has not put forward a reasonable allocation methodology for determining its eligible cost basis based upon this standard. And so, WestRock has not met its burden of proof to establish that it is entitled to receive an additional grant payment under Section 1603.

In light of the foregoing, the Court:

1. **GRANTS** the government's motion for summary judgment;

2. **DENIES** WestRock's motion for partial summary judgment;

3. **DENIES** as moot WestRock's motion for a hearing; and

4. **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

The parties shall bear their own costs.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge